*HUSA*
*Salem*        *14-2411 JKS*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

FILED
LOGGED
ENTERED
RECEIVED

OCT 28 2014

CLERK AT GREENBELT
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY
AD   DEPUTY

I, Jason Powers, being first duly sworn, hereby depose and state as follows:

### I.   INTRODUCTION

1.      I have been employed as a Special Agent with U.S. Small Business Administration

(SBA), Office of Inspector General (OIG), since 2008.  I am a graduate of the Federal Law

Enforcement Training Center's (FLETC) Criminal Investigator Training Program (CITP).

Immediately prior to that, I was employed by SBA as a Financial Analyst managing a portfolio

of investments.  I am Chartered Financial Analyst (CFA) and Certified Fraud Examiner (CFE). I

am assigned to the Baltimore Field Office for SBA-OIG.   During my tenure with SBA-OIG, I

have been assigned to investigate a variety of white-collar offenses, to include: loan fraud,

procurement and contract fraud, bank fraud, wire fraud, and mail fraud.  I have personally

prepared and participated in the execution of search and arrest warrants involving violations of

federal criminal laws.  During the execution of these warrants, I have recovered and participated

in the recovery of items of evidence which were later utilized in the successful prosecution of

criminal offenses.

2.      The investigation in this matter is a joint effort between the U.S. Air Force Office of

Special Investigations (AFOSI) and the Small Business Administration ("SBA") Office of

Inspector General ("OIG"), with support from the General Services Administration ("GSA")

OIG and asset forfeiture support from the Defense Criminal Investigative Service ("DCIS").

3.      The information contained in this affidavit is based on my personal knowledge, facts

accumulated by other agents during the course of this investigation, on information obtained

during interviews, on information found in court records, on review of documents and interview

reports, and information conveyed to me by other law enforcement officers involved in the

investigation.  I am setting forth only those facts and circumstances necessary to establish

probable cause for the issuance of the requested search and seizure warrant.  Unless otherwise

indicated, all written and oral statements referred to herein are set forth in substance and in part,

rather than verbatim.

4.       I am currently participating in the investigation of TONY NWAGBARA **DANIELS**

("**DANIELS**") of Danison, Inc. ("Danison") and others, including  several employees of Goel

Services, Inc. ("Goel")

5.       This affidavit sets forth specific facts and circumstances that I believe establish probable

cause that **DANIELS**, through Danison, conspired with members of Goel Services to defraud the

United States, in violation of 18 U.S.C. § 371; that **DANIELS** and Goel Services employees

utilized e-mail communication in furtherance of the scheme, in violation of 18 U.S.C. § 1343

(wire fraud); and, that **DANIELS** made material false statements to the government regarding

Danison, in violation of 18 U.S.C. § 1001 (false statements).

6.       The SBA was an independent agency within the executive branch of the federal

government that was created by Congress in 1953 for the purpose of encouraging the

development of small businesses.

7.   `     The 8(a) Business Development Program was a business assistance program for small

disadvantaged businesses operated by the SBA.  The 8(a) program offered a broad scope of

assistance to firms that were owned and controlled at least 51 percent by socially and

economically disadvantaged individuals.

8.       Participants in the 8(a) program were eligible to bid on sole source government contracts

that were reserved for companies in the 8(a) program. These contracts were sometimes referred

to as 8(a) "set aside" contracts.

### Goel Services, Inc.

9.     PJ Goel owned and operated Goel, a Washington, D.C. based business.

10.    Goel performed renovations, design build, asbestos and lead paint abatement, insulation, demolition, wrecking, general construction, sewer evaluation services, computer network services, computer equipment and accessory sales, and internet services. Goel participated in SBA's 8(a) Program from June 11, 2003 until graduating from the program on June 11, 2012.

### Danison, Inc.

11.    DANIELS owned Danison, a Washington, D.C.-based business.

12.    Danison performed as a general contractor, including performing construction and engineering services, maintenance, repairs and installation.  Danison entered SBA's 8(a) Program November 14, 2009 and is due to graduate November 14, 2018.

### BACKGROUND

13.    This investigation was initiated by a referral from The Honorable Judge Sean D. Wallace, of the Circuit Court for Prince George's County, Maryland, to the U.S. Attorney's Office for the District of Maryland.  Judge Wallace had concluded a three-day trial in which Goel Services, Inc. sued Danison, Inc. for contract breach and related claims, and in which Danison filed counterclaims.  In his written opinion, Judge Wallace stated, in part, "from the evidence presented at trial, it is clear that Goel, although ostensibly a subcontractor, was fraudulently obtaining a small business preference to which it was not entitled by acting through Danison, the nominal eligible small business."

## FACTS SUPPORTING PROBABLE CAUSE

### Conspiracy to Defraud the United States

14.     In 2009, Goel Services was awarded and performed a U.S. Government ("USG") contract to demolish two cottages on the grounds of Joint Base Andrews ("JBA"), located in Prince George's County, Maryland.  At the time, Goel Services was certified by the SBA as an 8(a) business .  Goel Services subsequently learned that there were five additional cottages that JBA wanted demolished when funding became available. That funding became available in 2011 and JBA put out a contract offer to demolish the buildings (the "demolition project").

15.     The demolition project was designated sole source and, therefore, was not subject to open competition.  JBA initially considered awarding the contract to Goel Services, but the demolition project had a North American Industry Classification System ("NAICS") code that mandated that the contract be awarded to an 8(a) business smaller than Goel Services.  The NAICS code for the contract required that the business have revenues that did not exceed $14 million.  Goel Services had annual revenues of approximately $30 million.

16.     Danison was certified by the SBA as an 8(a) business and was small enough to meet the NAICS designation for the demolition project.  While Danison met the size standard for the NAICS code on the project, it was a one person company consisting only of **DANIELS.** Further, Danison did not have substantial demolition experience.  On the other hand, Goel Services had the necessary background and expertise to carry out the demolition. ████████████████████ ████████████████████████████████ Goel Services and Danison agreed to use Danison's status to procure the contract for the demolition project in order to have Goel Services perform all the work.  This agreement was not shared with the government.

4

17.     One of the regulations applicable to the contract was Federal Acquisition Regulation
("FAR") clause 52.236-1 – Performance of Work by the Contractor. This FAR clause requires
that the selected contractor perform on the site, and with its own organization work equivalent to
35-percent of the total work on the contract. If the contractor wished to reduce this percentage, it
was required to request a reduction through the SBA and the Contracting Officer. The contract
also included FAR clause 252.219-7009 – Section 8(a) Direct Award. This FAR clause required
that the prime contractor not subcontract the performance of any of the requirements without
prior written approval from the SBA and the Contracting Officer.

18.     Despite the inclusion of these two FAR clauses in the contract, the two companies
arranged for Goel Services to perform almost 100-percent of the work on the contract. During
the civil suit, Pijush ("P.J.") Goel, President of Goel Services, testified on May 15, 2013: "we ran
this job, we performed this job, we took all the risk on this job, and Tony [**DANIELS**] did
nothing but stand around and sign papers." At no point did Danison request a reduction in the
percentage of total work that it would perform or obtain written approval to subcontract any of
the work in compliance with the two FAR clauses.

19.     Goel Services and Danison then set out to obtain the contract. Their first proposal to
perform the work was for more than $1.4 million. However, JBA actually determined that
$1,350,000.00 of funding was available to spend on the demolition project. Danison learned that
its first bid exceeded the available funding and reduced its proposal, titled "Contractor Estimate,"
to $1,160,683.43, which in its bid estimate included 10% profit and 10% overhead.

20.     Contrary to the Contractor Estimate submitted to JBA, Goel Services and Danison
anticipated that the actual cost to perform this project would be approximately $400,000,

producing a profit of approximately $700,000.   This represented a 175-percent profit markup

from the company's actual costs, in excess of the stated 10-percent profit and overhead margins.

### Goel Services' Control and Performance of the Contract

21.      According to Danison emails obtained pursuant to search warrants executed in support of

this investigation, the Danison proposals were prepared by an employee of Goel Services, on

Danison letterhead.  That Goel employee then requested that **DANIELS** go to Goel's office to

sign the proposal.

22.      After **DANIELS** signed the proposal, Goel transmitted the proposal to the Air Force via

UPS and emailed a copy of it to **DANIELS**.

23.      On September 29, 2011, JBA accepted Danison's bid of $1,160,683.43 and awarded the

contract to Danison.

24.      During the performance of the demolition contract at JBA, Goel employees sent

**DANIELS** at least one report from a sub-contractor and instructed him to send it to the Air

Force.  Goel employees also from time to time emailed **DANIELS** to inform him that documents

that needed to be submitted to the Air Force were ready for him to come in and sign.

25.      During the course of the contract performance, the Air Force contract specialist reminded

**DANIELS** and Goel that Danison was the prime contractor and Goel was just a subcontractor,

and that therefore, all communication needed to be between the government and Danison.  On at

least one occasion, in an email to **DANIELS** on October 19, 2011, the contract specialist

expressed confusion as to whether Danison was actually the prime contractor and Goel was just a

subcontractor.

26.      In response, **DANIELS** emailed the following to the contract specialist later that

morning:

Good morning Lakisha. Yes Danison Inc. is the prime
contractor 100% to this project and Goel services is the
subcontractor. Please do not be confused. If there is any
concern, please do not hestitate to call or email me. Thanks.

Tony Daniels
Danison Inc.

27.     On October 20, 2011, the Air Force contract specialist asked **DANIELS** in an email, "Is

Goel Services providing the performance and payment bonds for you?" **DANIELS** responded

by email on October 21, 2011, and stated, "No, Danison Inc. is providing the bonds."

28.     In fact, Danison had been unable to obtain performance and payment bonds required

under the procurement.  Goel Services therefore arranged for the bonds to be issued by Lexon

Insurance Company.  Lexon insisted that Danison and Goel Services enter into a collateral

administration agreement that required Danison to deposit all monies it received from JBA for

the project into an escrow account jointly administered by Danison and Goel Services.

29.     The indemnity agreement for the bonds was signed by **DANIELS**, President, on behalf of

Danison, Inc., and Piyush .J. Goel, President, on behalf of Goel Services, Inc. on October 12,

2011, just nine days before **DANIELS** emailed the contract specialist and stated, "Danison Inc.

is providing the bonds."  At the top of the indemnity agreement, someone handwrote "Danison in

a joint venture w/Goel."

30.     At trial, in the civil suit between Danison, Inc. and Goel Services, **DANIELS** testified

that Goel Services provided the funds for the bond on the Air Force contract.  Later in his

testimony, **DANIELS** referred to Goel Services as having "brought the bond" on the Air Force

contract.

31.     During the course of this investigation, AFOSI and SBA OIG interviewed the contracting

specialist who had oversight on the demolition contract.  During the interview, the contracting

specialist stated if Danison could not get its own bonding, the contract would not have been awarded to Danison.

32.    In two emails dated March 8, 2012, the Air Force contract specialist asked **DANIELS** how many contractor and subcontractor employees **DANIELS** had working at JBA.

33.    **DANIELS** forwarded the contract specialist's email to one of Goel Service's principals, P.K. Goel, and wrote:

> Good morning PK. Please kindly go through this email from
> Lakisha this morning regarding an urgent response to Danison
> employee to the Andrews project. The answer to this according to
> her email is needed before noon. Please guide in this response
> accordingly.
> Tony

34.    Later that morning, **DANIELS** sent an email to the contract specialist that included the following statements:

> ...Please find below the breakdown of the workforce at
> Andrews Air force base cottage demo project per your
> request.... Prime Contractor-Danison Inc. Danison
> employees to the site: 12Breakdown: 2 Administrators 10
> Labors Subcontractor-Goel Services Goel employees to the
> site: 25Breakdown: 5 Administrators 20 Labors Total
> workers at the site will then be: 37

35.    According to Danison, Inc.'s IRS Forms 1120, "U.S. Corporation Income Tax Return," for the 2011 and 2012 tax years, which **DANIELS** signed, Danison Inc. paid $0 in salaries and wages for those years.  According to **DANIELS'** IRS Forms 1040 for the 2011 and 2012 tax years, "Net Profit from Business" section, **DANIELS** did not "make any payments in 2011 [or 2012] that would require [him] to file Form(s) 1099...."

36.    Danison Inc. has not reported having any employees to the Maryland Department of Labor since he formed his company in 2006.

8

37.     Danison Inc. did not report having any employees to the District of Columbia Tax Division until early 2013, when it began reporting.  Danison was awarded a contract by the General Services Administration in 2013 for construction inspection services, and Danison "inherited" employees from the incumbent contractor, whom Danison had to continue paying to perform those inspections.

38.     Danison Inc. did not report having any employees to the Virginia Employment Commission during the second, third or fourth quarters of 2011 (the JBA demolition project began in the third quarter of 2011) or the first or second quarters of 2012.  Danison reported $2,886.72 in wages for two employees during the third quarter of 2012, which is the quarter in which the JBA demolition project ended. (█████████████████████████████

██████████████████████████████████████████

39.     At trial, in the civil suit between Danison, Inc. and Goel Services, **DANIELS**' attorney stated in his opening statement to the court, "Danison is what's known as a micro-8(a).  Danison has one employee, Mr. Daniels. Danison has no equipment, no collateral, no bonding capacity, very little revenue…. Danison acts primarily on a fee basis to act as a general contractor."

40.     During this investigation, I learned that JBA will not award contracts if it knows the contractor does not intend to perform their required percentage of work.

### The Civil Suit between Goel Services and Danison, Inc.

41.     After the work was completed, Danison did not split any of the $700,000 profit with Goel Services.  As a result of their disagreement, Goel Services filed breach of contract and related claims against Danison in the Circuit Court for Prince George's County, Maryland on July 31, 2012. Danison filed counterclaims on August 27, 2012.

9

42.    In the civil suit, Goel Services alleged that the agreement between it and Danison

provided that Danison would use its NAICS status to meet the contract's size standards and

would provide some supervisory services for the demolition.  In exchange, Danison would

receive a fee of $50,000 plus reimbursement of its costs.  Goel Services claimed that under their

agreement, Goel Services would be responsible for performing virtually all of the contract

services and would receive the majority of anticipated profits.  **DANIELS** claimed that the

agreement was that Danison, as the prime contractor, would retain the majority of the profits

from the job and Goel Services, as a subcontractor, would receive reimbursement of its costs

plus a 10% profit.

43.    Based on evidence presented to the circuit court during the civil suit, the court found that

the "credible testimony and evidence support Goel's claim about the nature of the Goel-Danison

relationship.  In other words, the Court found that the parties' agreement was for Danison to

receive a $50,000 fee for acting as a 'figure head' prime contractor, while Goel would perform

virtually all of the services under the contract and retain nearly all of the profit."  Importantly,

information regarding this arrangement had never been shared with JBA before the contract was

awarded.

44.    Court documents from the civil suit disclosed Goel Services employees and

**DANIELS** met several times prior to the award of the demolition contract.  During these

meetings, they discussed the upcoming project, including partnering up to acquire the work,

financial responsibilities and fee arrangement for Danison.  The fee arrangement meant,

essentially, that Goel Services would "buy" the contract from Danison for a $50,000 fee and

perform all the work.  One of the meetings took place on September 28, 2011, one day before the

award of the demolition contract.  Attendees at the meeting from Goel Services included, Pijush

"PJ" Goel (President), Scott Gamache (Director of Demolition), Richard Kerr (Director of

Construction), and Prabodh "PK" Goel (Project Manager for the demolition project).  Present

from Danison was **DANIELS**.  During this meeting, the participants again discussed the terms of

the agreement between Danison and Goel Services to execute this contract, including Danison's

$50,000 commission.  Based on information discussed during this meeting, Goel Services

created a written subcontract to capture the agreement between Goel Services and Danison in

writing.  The written subcontract agreement was not submitted to the government.

45.     Under the written subcontract, Goel Services was to perform the entire demolition

contract.  Accordingly, the value of the subcontract was $1,042,568.43; approximately 89.82%

of the total contract value ($1,160,683.43). The scope of work stated, in part:

> Subcontractor [Goel Services]. . . shall furnish anything necessary to complete in place
>
> the See Sections listed below work as set forth below in strict accordance with the Prime
>
> Contract Documents ....

> SECTIONS:
>     a.     All.
> INCLUDES:
>     b.  Furnish all labor, materials, insurance, and taxes to perform as per drawings
>         and specifications.
>     c.  All work per Prime Contract, except for:
>         i.   Prime Contract Quality control.
>     d.  Subcontractor is responsible for quality control of its own work.
>     e.  Attending all preparatory and initial meeting for your scope of work.
>     f.  Create activity hazard analysis for each defined feature of your work and for
>         each operation that will have an associated safety hazard…
>     g.  Permits and notifications.
>     h.  Submittals



48.    In his written opinion, Judge Wallace also stated, in part, "from the evidence presented at trial, it is clear that Goel, although ostensibly a subcontractor, was fraudulently obtaining a small business preference to which it was not entitled by acting through Danison, the nominal eligible small business."

49.    After the trial, Judge Wallace ordered that a garnishment he had imposed at the start of the case be continued.  In so ordering, he stated, "It is beyond question that Goel and Danison conspired to knowingly submit fraudulent claims, and to make false statements material to these claims, to the federal government in connection with this 8(a) procurement.  Thus, they are liable for damages under the False Claims Act...."

**False Statements to the Small Business Administration**

50.    Based on my experience, as well as the experience of other special agents, I know that a common type of procurement fraud involves  companies that do not qualify for certain contracts

based on size standards or code designations, which then use disadvantaged businesses as a "shell" or "front" company for the purpose of obtaining government set aside contracts. The "unqualified" company then performs the majority of the work and retains the majority of the profits. The scheme generally involves multiple false statements and/or claims to the federal government. The scheme is often repeated over numerous contracts.

51.     A review of court records related to the civil suit disclosed that Goel Services and Danison had previously performed "pass through" work, where Danison secured the contract and Goel Services performed the work for a five percent fee.

52.     A review of the SBA 8(a) file from SBA's Washington Metropolitan Area District Office (WMADO) disclosed several statements believed to be false in connection with Danison's Annual Update signed by **DANIELS** on November 12, 2012 for the period covering November 12, 2011 to November 2012. Statements believed to be false were provided by **DANIELS** on SBA Form 1010, which answered questions regarding ownership of the company, pending lawsuits, bonding support, and other topics.

13 CFR § 124.303: What is Termination?

53.     According to 13 CFR § 124.303, the SBA may terminate the participation of a concern in the 8(a) Business Development program prior to the expiration of the concern's Program Term for good cause. Examples of good cause include:

a)  "Submission of false information in the concern's 8(a) BD application, regardless of whether correct information would have caused the concern to be denied admission to the program, and regardless of whether correct information was given to SBA in accompanying documents or by other means."

b) "Failure by the concern to obtain prior written approval from SBA for any changes in ownership or business structure, management or control ..."

c) "Failure by the concern to disclose to SBA the extent to which non-disadvantaged persons or firms participate in the management of the Participant business concern."

### False Statement - Change of Ownership

54.   The investigation disclosed STG had a 49 percent ownership interest in Danison starting at the end of 2012. This ownership was hidden and unknown to the SBA. **DANIELS** failed to disclose and obtain prior written approval from the SBA regarding this change of ownership in accordance with 13 CFR § 124.303. On November 12, 2012, in Danison's third program year of the 8(a) Business Development (BD) Program, **DANIELS** signed a submitted SBA Form 1010, Annual Update in the 8(a) BD Program. In Section II, Business Management and Administration, **DANIELS** answered "no" to the following question: "Have there been any changes in owner ship of the business concern in the past two years? If yes, identify prior owners by name, percentage of ownership, and dates of ownership."

### False Statement – Financial & Bonding Support/Joint Venture

55.   **DANIELS** indicated "No" to the following questions: "Does the business concern have any existing management, joint venture, indemnity, consulting, distributorship, licensing, trust or franchise agreements?..." and "Does (or do) any outside entity(ies) or individual(s) provide financial or bonding support, licenses or required professional certification, office space or equipment to the applicant business concern?..." Contrary to **DANIELS'** answer, the investigation disclosed **DANIELS** signed a General Agreement of Indemnity and a Collateral Administration Agreement in reference to the demolition contract. The purpose of the collateral

administration agreement was, in part, to define that all funds from the demolition contract had to go into a collateral account, under the control of Invotex, LLC ("Invotex"). The investigation also disclosed Goel Services assisted with bonding support for this project and that STG and Danison entered into a revolving credit agreement in February 2012.

False Statement – Pending Civil Lawsuit

56.     **DANIELS** indicated "No" to the following question: "Is the applicant business concern a party to any pending civil lawsuit?..." On the date **DANIELS** signed the document and for the period covered, Danison was a party to the civil suit, which was pending at the time. The lawsuit was filed on July 31, 2012 by Goel Services against **DANIELS** and Danison in Prince George's County Circuit Court. Danison filed counterclaims against Goel Services on August 27, 2012.

57.     The above statements were made on SBA Form 1010, which gives the following disclaimer and certification:

a)      "NOTICE OF CRIMINAL PENALTIES AND ADMINISTRATIVE REMEDIES FOR FALSE STATEMENTS: Under Title 18 U.S.C. § 1001 and Title 15 U.S.C. § 645, any person who misrepresents a business concern's status as an 8(a) Program participant, or makes any other false statement in order to influence the certification process in any way, or to obtain a contract awarded under the preference programs established pursuant to sections 8(a), 8(d), 9 or 15 of the Small Business Act, or any other provision of Federal Law that reference Section 8(d) for a definition of program eligibility shall be: (1) Subject to fines and imprisonment of up to 5 years, or both, as stated in Title 18 U.S.C. § 1001; (2) Subject to fines of up to $500,000 and imprisonment of up to 10 years, or both, as stated in Title 15 U.S.C. § 645; (3) Subject to civil and administrative remedies,

15

including suspension and debarment; and (4) Ineligible for participation in

programs conducted under the authority of the Small Business Act."

b)      CERTIFICATIONS: "By signing this form, I certify that I have reviewed the

response to every question on this form and all supporting documents required by

this form, and that all responses and documents are true and complete to the best

of my knowledge, and that I understand that SBA is relying on this information in

making its determination of my company's eligibility for 8(a) BD Program

certification. Form must be signed by President/CEO/Proprietor/Management

Member/General Partner."

58.     The SBA Form 1010 was signed by **DANIELS** on November 12, 2012.

## CONCLUSION

59.     Based on the facts set forth herein, I respectfully submit that there is probable cause to

believe that **DANIELS** and others did in fact devise a scheme, utilizing electronic

communication, with the intent of obtaining money by means of fraudulent pretenses from the

United States, in violation of 18 U.S.C. §371 conspiracy to defraud the United States; wire fraud,

in violation of 18 U.S.C. § 1343; and, false statements, in violation of 18 U.S.C. § 1001, and I

respectfully request that an arrest warrant be issued for **DANIELS**.

60.     I have signed this document under oath as to all assertions and allegations contained

herein and state that its contents are true and correct to the best of my knowledge.

Special Agent Jason Powers
U.S. Small Business Administration
Office of Inspector General

16

Subscribed and sworn to me on this _____ day of October 2014.

_____
[JUDGE]
United States Magistrate Judge
District of Maryland